# EXHIBIT 1

| STATE OF INDIANA | ) | IN THE ST. JOSEPH CIRCUIT COURT |
| --- | --- | --- |
| | )SS: | |
| COUNTY OF ST. JOSEPH | ) | CAUSE NO. 71C01-1708-CT-000366 |

| JANE DOE, | ) | |
| --- | --- | --- |
| Plaintiff, | ) | University of Notre Dame |
| | ) | AUG 2 2 2017 |
| v. | ) | |
| | ) | Office of VP & Gen Counsel |
| UNIVERSITY OF NOTRE DAME DU LAC, | ) | |
| | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Jane Doe[1] ("Jane" or "Plaintiff"), by and through her undersigned attorneys, files this Complaint and, in support thereof, alleges as follows:

I. NATURE OF THE ACTION

1. This is an action for damages arising from the mishandling and deliberate indifference by Defendant University of Notre Dame Du Lac ("the University" or "Notre Dame") in connection with the sexual assault of Jane. Although Jane desired to deal with the situation in a private way, a Title IX investigation was commenced by the University, exposing her identity as the complainant to her attacker, whom she feared. Dragged into a process against her wishes, during final exam week in the Spring Semester of 2016, Jane's own mental health and physical health were ignored by the University. After violating her privacy rights, the University then "addressed" her serious concerns about being on campus with her attacker by

---

[1] Plaintiff is seeking to proceed anonymously because of the highly sensitive nature of the events leading to this claim and forming the basis for her Complaint, and the fact that the University is fully aware of her identity and will not be prejudiced in any way. Plaintiff also seeks to maintain the privacy rights of her assailant by requesting permission to identify him anonymously as "Jack Roe." The plaintiff requests that the Court utilize its discretion to permit this action to proceed in such a manner in accordance with the guidelines established under *Doe v. Town of Plainfield*, 860 N.E.2d 1204 (Ind. App. 2007).

1

orchestrating the closing of the Title IX investigation so that the student athlete who attacked her, a football player, could transfer to another university with a clean record. The University chose this route as an expedient method to deal with the situation, following a pattern of dealing with such cases in the manner that made Notre Dame come out on top regardless of the impact on the students involved.

## II. THE PARTIES

2. Plaintiff Jane Doe is a natural person who now resides in the state of Colorado after withdrawing from the University to attend to her resulting physical and mental health crisis. During the events described herein, Jane was first enrolled as a full-time, tuition-paying, undergraduate student at Holy Cross College, a college affiliated with the University, in a program designed to transition her to Notre Dame, and pursuant to which she subsequently enrolled at the University.

3. Defendant University is located in Notre Dame, Indiana, and has its principal place of business in Notre Dame, Indiana.

4. At all times material hereto, the University acted by and through its agents, servants, employees, and representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of the University's business, mission and/or affairs.

5. The University and Holy Cross College act in concert; the Gateway Program is a program employed at Holy Cross College to facilitate the enrollment of students at the University who are not granted admission in their first year of college.

## III. JURISDICTION AND VENUE

6. This Court has jurisdiction over the parties and subject matter of this litigation.

7. Venue is proper in St. Joseph County, Indiana, as the defendant is located there and the acts complained of occurred there.

IV. FACTUAL ALLEGATIONS

8. For the 2015/16 academic year, Jane was a student in the "Notre Dame Gateway Program" at Holy Cross College which required her to attend one class at Notre Dame each semester.

9. In January 2016, Jane had agreed to accompany Jack Roe, an intoxicated Notre Dame student/athlete, to ensure his safe return to his dorm room on the Notre Dame campus. Once inside his room in the Alumni Hall dormitory, Jack sexually assaulted Jane.

10. Jane desired to deal with the attack in privacy by avoiding future contact with the perpetrator; three months after the assault, however, a female Notre Dame student approached Jane to ask for her anonymous support of a second victim who was hesitant to come forward regarding a purported assault by the same perpetrator. This student took Jane's story to the Notre Dame Title IX Office, which contacted Jane in mid-April. Jane was reluctant to participate in an investigation as she was not familiar or properly trained in the Title IX process as she was a Holy Cross College student at the time of the incident.

11. During final exams week in Spring 2016, the Title IX Office informed Jane they had identified the perpetrator and would be contacting him to identify Jane as the complainant. This forced Jane to contact her father to disclose the attack for the first time. Jane and her father agreed with the Title IX Office that the case of the second victim was to be thoroughly investigated prior to contacting the perpetrator. After four days and no apparent investigation, the Title IX Office decided to move forward to disclose Jane's name to the perpetrator despite her

3

and her father's explicit demand they not do so. The perpetrator was told Jane was not participating in the procedure.

12.  Jane's paramount concern at this point was facing her attacker on campus as she returned to begin her sophomore year at Notre Dame. The University "addressed" this concern by recommending Jane close the Title IX investigation as it would be difficult for a Notre Dame football player, who had already been suspended from the team for "attitude issues", to transfer to another school with a pending sexual assault case. Despite not opening the case in the first place, Jane agreed to close it. The perpetrator transferred to a Power Five football school where he is expected to play this Fall. This approach served to protect Notre Dame's reputation (and opened up an additional football scholarship), while ignoring the impact on the victim. Jane completed the Fall Semester of 2016 at Notre Dame in good academic standing, but withdrew one month into the Spring 2017 term to attend to her deteriorating physical and mental health.

13.  After the University learned that Jane had suffered harm, its primary concern should have been to stabilize and protect Jane. In fact, the University was obligated under the official guidance from the Department of Education's Office for Civil Rights to take certain affirmative steps to protect Jane. It did not. Instead, the University thrust her into an exposed position while implementing its flawed and self-serving Title IX apparatus, leaving Jane unprotected, vulnerable, and injured.

14.  The University's execution of the Title IX protocol creates the illusion it has a legally compliant process, but the real priority guiding its execution is protecting Notre Dame's "golden brand" above all else, while failing to address the welfare of its students. The University consistently overreacts to minor situations, while sweeping major allegations under the rug. The

4

University is arbitrary and capricious in its execution of Title IX. Several cases support this conclusion:

  a. Case One: John Doe v. Notre Dame: Alleges the University ignored the mental health needs of a student to pursue a vindictive proceeding which did not involve sexual assault, leading to the dismissal of a student.
  b. Case Two: alleges a University employee who was found to be manipulating student athletes resulted, not in the termination of the employee, but in her transfer to another position where she could continue to play out her scheme with other students.
  c. Case Three: involving Notre Dame's use of Title IX process to permanently dismiss student in accidental touching case.

There are other cases as well which substantiate the point.

15. In the months that followed, employees of Notre Dame used rather questionable maneuvers to assist Jack's transfer to a Power Five school where he has been able to avoid further disciplinary action and is continuing to pursue his football career. This conduct by Notre Dame shows its deliberate indifference to the rights of female students

16. The conduct of Notre Dame relative to Jane's situation is similar to recent high-profile incidents at other schools, and nearly identical to a case involving defensive lineman Sam Ukwuachu at Baylor University. Mr. Ukwuachu's story began with a suspension from the Boise State University football program for "unspecified disciplinary violations" after which he transferred to Baylor University. There he was indicted for multiple, additional sexual assaults, which led to the discovery of previous incidents and exploded into a dispute regarding what was

5

communicated between the two schools prior to his transfer. In the end, Baylor head football coach Art Briles was fired and Baylor president Ken Starr resigned.

17. After Roe assaulted and raped Jane on the Notre Dame campus, she did not report it as she was both terrified and unaware of any protection against the 6'5", 278 pound football player. Jane called a classmate in an effort to escape during the incident. In a rage, Roe grabbed her phone and shattered it on the table in his dorm room. This display of violence was a bit suffocating to anyone who would dare breathe a word of it.

18. For three months Jane internalized this nightmare and avoided places on the Notre Dame campus where she might cross Roe's path. On April 14, 2016, Roe was suspended from the football team for an unspecified "violation of team rules". This prompted a Notre Dame classmate of Jane to express: "It must be related to the rape involving [Roe] and a female athlete from one of the women's sports programs (a good friend of her best friend)." Jane then mentioned she had a "troubling incident" with Roe in January. The classmate asked if she could "help Jane obtain some counseling". But instead of seeking psychological support, the classmate described Jane's situation to an Assistant Rector who transmitted the information to the Title IX office without Jane's consent or understanding of Title IX. On April 21, 2016, Jane received an email to report to Heather Ryan's Title IX office.

19 The instant Ms. Ryan explained the Title IX process in a speedy, insensitive manner, Jane, who was clearly and understandably fearful of Roe's retaliation, made it clear she did not want to make a report, did not want to participate in an investigation, did not want to not disclose the perpetrator's name or residence, and absolutely did not want her name disclosed to the man that had raped her.

6

20. Nonetheless on May 6, 2016, during final exams week, Ms. Ryan sent an email to Jane indicating "she believed she had learned the identity of the respondent" and that Title IX would be initiating an investigation. Ms. Ryan subsequently wrote that a "no-contact order" would be put in place between Jane and Mr. Roe--this was the first indication Jane's name would be given to the rapist.

21. Panic set in as Jane read Ms. Ryan's note. She contacted her father, and for the first time disclosed the January incident and subsequent saga with the Title IX Office. Her father immediately contacted Ms. Ryan and it was agreed there would be no action taken for at least the next 48 hours while the victim and Roe were both still on campus.

22. The following Monday, Jane's father was forced to contact Notre Dame Campus Police to have them visit the Title IX Office on his behalf to have someone return his critical calls to discuss continued protection of Jane's privacy and security. Bill Stackman (Ms. Ryan's supervisor) finally answered and agreed it was prudent to fully investigate the "second victim" prior to initiating contact with Roe.

23. One week later on Monday, May 16, 2016,, Mr. Stackman informed Jane's father: "Notre Dame is not obligated to obtain consent from either Jane or her father prior to providing her name to her rapist. We acknowledge we have received your written and verbal notice forbidding it, however, Notre Dame will proceed today to notify Mr. Roe of the complaint, including its source."

24.. When Jane's father asked Mr. Stackman what progress was made on identifying and speaking with the second victim, he responded: "No rock has been left un-turned, however we cannot make anything available for your view, inclusive of a copy of the notice to Mr. Roe, as that would violate Mr. Roe's right to privacy." Mr. Stackman did, however, paraphrase the

7

notice: "[Jane] accuses you of sexual misconduct but does not plan to do anything about it." This was the worst message to hand to a rapist, and basically constituted an invitation to retaliate. So Jane's anxiety and turmoil increased.

25. Jane's father and Jane then contacted her Notre Dame classmate, the original source of the "second victim story". They learned she had not been contacted by the Title IX Office since the initial contact in April. That rock was left un-turned, contrary to what Mr. Stackman.

26. The final blow from the Title IX process occurred in June. Jane contacted her Title IX Resource Coordinator to discuss options and next steps regarding campus housing, etc. As Jane described her anxiety of crossing paths with Roe in the future, the coordinator recommended: "You should close your case as it is holding up Mr. Roe's ability to transfer to another school, possibly forcing him to remain enrolled at Notre Dame where you would have to face him in the Fall." Of course, this made perfect sense if Notre Dame was interested in opening up a scholarship for another football player and sweeping Roe's conduct under the rug, disregarding Jane's interests and serving only their own.

27. Although Jane decided to deal with her sexual assault act privately, Jane was enticed to provide anonymous support for a purported second victim. The University dragged Jane into a case she did not want opened; failed to investigate a second victim; violated her privacy rights by exposing her to to her attacker; recommended Jane "close" the investigation despite knowing a crime had likely taken place; helped her attacker transfer to another school to continue his football career. The University's conduct has caused Jane to suffer and incur damages.

8

28. Notre Dame had an obligation to protect Jane once she was compelled forward. But rather than take appropriate actions to remove the perpetrator from Notre Dame, employees of the university arranged for Jane's case to be closed. The process favored the continuation of Roe's football career. This institutional response to violence against women reeks of indifference and violates the spirit of Title IX. Notre Dame's conduct and failure to act properly relative to Jane's situation is discrimination on the basis of her gender.

29. Jane's case exposed a significant gap in Notre Dame's Title IX Program. Notre Dame collaborated with Holy Cross College to create the "Notre Dame Gateway Program". The program requires HCC students to attend classes on the Notre Dame campus, and provides and encourages open access to joint social activities. While Notre Dame requires its own students to take mandatory educational sessions on the topics of alcohol abuse, sexual misconduct, and student's rights and remedies under state and federal law as required by the Office of Civil Rights (OCR), there was no such session for Notre Dame Gateway students. Notre Dame failed in making Jane and other female Gateway students aware of its Title IX's charter, rights, remedies and processes. Not until after Jane brought this gap to the attention of the University did it try to close the gap; and only recently did it announce a joint effort with St. Mary's College and Holy Cross College to work in unity on handling sexual assault cases on all three campuses.

30. Head Football Coach Brian Kelly and Athletic Director Jack Swarbuck failed to properly vet athletes prior to their assimilation into the student body. Training on alcohol abuse, and sexual misconduct and its consequence was lax at best. Their conduct and failure to act also serves as proof of deliberate indifference on the part of Notre Dame.

31. As if being raped was not enough, Jane's privacy and sense of security have been compromised for the rest of her life

9

32. Jane now reacts nervously any time a large person enters the room and continues to deal with the psychological trauma of the rape.

33. Jane must deal with conflicting messaging that occurs at Notre Dame while she undergoes her own formation. Notre Dame represents itself as a place of Catholic values, but acts inconsistent with that message. The proclaimed respect for Truth and Justice at Notre Dame is empty chatter when Notre Dame covers up sexual violence and helps offenders get away with it

34. The failure of the University to respond appropriately to Jane's situation was too much for Jane to bear, forcing her to withdraw from the University, and losing tuition money; in addition, her investment in pursuing a Notre Dame education turned out to be based on a fraudulent inducement. She would not have invested in one and one- half year's tuition had she known Notre Dame would treat her as they did under the foregoing circumstances.

35. Notre Dame needs to improve its recruiting process to better vet athletes before they are released into the student body.

36. Notre Dame needs to implement a secure reporting system so victims can be 100% confident they can anonymously report an incident. Once there is a "match" of multiple reports involving a single perpetrator, an escalation can take place to address the situation properly.

37. The University dragged Jane into a case she did not want opened; violated her privacy rights; exposed her to her attacker; and then ignored her interests, "closed" the investigation and helped her attacker move along to another school. The University's conduct has caused Jane to suffer and incur damages.

38. Notre Dame needs to compensate Jane for the losses she has suffered; these include loss of tuition money, loss of personal security and privacy, emotional duress, mental anguish, and physical and psychological injuries. She has incurred expenses for professional counseling. And Notre Dame needs to compensate Jane for devaluing her Notre Dame experience

## COUNT I

(Violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, et seq.)

39. Title IX of the Educational Amendments Act of 1972, 20 U.S.C. §§ 1681, et seq., provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

40. Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities. The University is a recipient of federal funds and, therefore, is bound by Title IX and its regulations.

41. The University discriminated against Jane and deprived her of the benefits of its education program on the basis of sex through its discriminatory, gender-biased implementation of its Policy on Sexual and Discriminatory Harassment and by ignoring her privacy rights, and then by dismissing investigation of her case and facilitating her male attacker's transfer to another school.

42. The University's Policy on Sexual and Discriminatory Harassment as conceived and implemented by the University was deliberately designed to favor the University and white, male student athletes,

11

43. The University also provided disparate levels of support to Jane during the investigation proceedings.

44. The actions of the University were intended to deliberately treat Jane less favorably than Roe, a male.

45. University officials had the authority to stop the wrongdoing. By doing nothing, they and the University were deliberately indifferent to Jane and similarly-situated female students, violating her Title IX rights, and causing her to suffer damages.

## COUNT II

### (Breach of Contract)

46. At all times relevant hereto, a contractual relationship existed between the University and Jane as a tuition paying student. On her part, Jane fully performed under her contract with the University.

47. The University, through its agents assigned to Jane's case, was required to act in accordance with the contractual obligations in addressing Jane Roe's allegations against Jane, and in conducting its investigation, while also protecting Jane's privacy.

48. For all the reasons set forth above, the University has materially breached its contracts with Jane by failing to comply with its policies and procedures in the course of its investigation and adjudication of Jane's case, and by arbitrarily disregarding its contractual duties throughout the proceedings.

49. Apart from breaching its express contractual obligations, the University breached and violated the covenant of good faith and fair dealing implied in its contracts with Jane by acting arbitrarily, capriciously, and in bad faith in connection with the handling of Jane's sexual

assault case, by acting in a manner inconsistent with Jane's reasonable expectations of a fair and impartial process, and by depriving her of the benefit of her bargained-for education.

50. As a direct, proximate, and foreseeable consequence of the University's numerous material breaches, Jane has been compelled to withdraw from the University and has been deprived of her ability to continue her education at the University, and her academic and career prospects, earning potential, and reputation have been severely and permanently harmed.

## COUNT III

### (Negligence and Invasion of Privacy)

51. The University owed Jane a duty of reasonable care in selecting, training, and supervising competent coaches, athletic directors, and impartial investigators, to investigate and decide her case and protect her privacy interests.

52. The University also owed Jane a duty to protect her privacy, under both federal law and the common law.

53. When the University undertakes to investigate allegations of sexual misconduct against one of its students, it owes the victim a duty to protect her from foreseeable harm.

54. By participating in the investigatory process in question, Jane reasonably relied upon the University's duty to protect her from harm.

55. Notre Dame breached these duties causing Jane to suffer damages

56. Jane has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, loss of tuition, and other direct and consequential damages.

WHEREFORE, Plaintiff Jane Doe respectfully requests the following relief:

a. an award of compensatory damages in an amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of education and professional opportunities, loss of future career prospects, loss of tuition, and other direct and consequential damages;

b. an award of prejudgment interest;

c. an award of attorney fees and costs pursuant to statutory or common law doctrines providing for such award;

d. Grant such other and further relief that the Court deems just and proper.

Respectfully submitted,

s/ Peter J. Agostino
Peter J. Agostino    (#10765-71)
Stephanie L. Nemeth  (#25721-71)
ANDERSON AGOSTINO & KELLER, P.C.
131 South Taylor Street
South Bend, IN 46601
Telephone: (574) 288-1510
Facsimile: (574) 288-1650
Email: agostino@aaklaw.com
Email: nemeth@aaklaw.com

*Attorneys for Plaintiff*

## JURY DEMAND

Plaintiff, by counsel, requests a trial by jury of this matter.

s/ Peter J. Agostino
Peter J. Agostino                    (#10765-71)

14